# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION


IN RE

TOP LINE GRANITE DESIGN, INC.,

        Debtor
_____

STEVEN WEISS, CHAPTER 7 TRUSTEE,

        Plaintiff,
                      Chapter 7
                      Case No. 22-40216-EDK

    vs.

JEANNE D'ARC CREDIT UNION AND
EDMILSON RAMOS

        Defendants.
_____

        DEPOSITION OF

        STEVEN WEISS


     September 12, 2025

       10:08 a.m.


      Litchfield Cavo

  6 Kimball Lane, Suite 200

    Lynnfield, MA  01940



  Charlene Jones, Court Reporter



```
 1              APPEARANCES OF COUNSEL

 2            (Via Zoom Video Conference)

 3


 4   On Behalf of the Plaintiff:

 5        SHATZ, SCHWARTZ AND FENTIN
          (by Mark J. Esposito, Esq.)
 6        1441 Main Street
          Springfield, MA  01103
 7        E-mail: mesposito@ssfpc.com

 8


 9   On Behalf of the Defendant:

10        LITCHFIELD CAVO
          (by Jessica C. Studstill, Esq.)
11        6 Kimball Lane, Suite 200
          Lynnfield, MA  01940
12        E-mail: studstill@litchfieldcavo.com

13

14

15

16

17

18

19

20

21

22

23

24
```



800.211.DEPO (3376)
EsquireSolutions.com

1  accounts.  When I say I got them, I got them
2  electronically by and large, and I also got some
3  documents from Avidia Bank, which is where the Debtor
4  had done most of its pre-bankruptcy borrowing, and got
5  some -- plus some other records, spreadsheets that came
6  from the company through its counsel at that time, and
7  that led to filing a report.
8         I went through the documents.  I filed a report
9  in, I think it was, filed in November of 2022 with the
10 Bankruptcy Court.  Once the case -- once my powers were
11 expanded and once the case was converted, I then went up
12 to Top Line and I took several boxes of records that I
13 thought would be necessary from the administration of
14 the case to see if there were avoidable transfers, to
15 see if there were monies owed to the company for any
16 other reason.
17        I also grabbed several of the computers.
18 Unfortunately, I did not get the passwords at that time,
19 so we haven't been able to open those.  But I took
20 probably six or seven big banker's boxes worth of
21 records, and then I know at one point during the course
22 of the case I filed a motion, what's called a Rule 2004
23 Examination against Jeanne D'Arc and this was before you
24 were involved, and they sent me a host of records



1    A.   I can't tell if this is part of my -- oh,
2  yeah.  "There appears to be other transfers that may be
3  preferential or fraudulent if the Debtor's accused of
4  paid other personal obligations of Mr. Ramos.  The
5  largest of these constitute payments to Jeanne D'Arc
6  Credit Union."  This was filed in the Court on
7  November 4, 2022.
8         MR. ESPOSITO:  Just for reference, this
9  document is number 203 in the main case.
10         MS. STUDSTILL:  Yes, I have one.
11    Q.   I guess generally I feel like I need to do
12  more background before I start showing you specific
13  documents so that we're not jumping all over the place.
14       I guess when you're looking at avoidance actions,
15  can you tell me sort of what you're looking for and what
16  goes into sort of your thought process of when to file
17  these types of actions?
18    A.   Sure.  You know, my job for -- my job as a
19  Trustee is to try to recover money for the bankruptcy
20  estate for distribution to creditors.  The Bankruptcy
21  Code gives me, gives all trustees, you know, standing
22  powers to do so.  One of those is Section 547 of the
23  Bankruptcy Code which governs preferential transfers.
24  The other is Section 548 of the Bankruptcy Code



1           MS. STUDSTILL:  Thank you.
2           (Off the record)
3      Q.   I know you weren't present at Mr. Ramos'
4　deposition for this case, but did you have a chance to
5　review his deposition transcript?
6      A.   I don't think I did actually.  I don't think I
7　did.
8      Q.   Do you recall -- you know, obviously not that
9　I need to tell you this because you're an attorney, so
10　you know all about attorney-client privilege, but not
11　getting into your conversations with your attorney, do
12　you recall answering questions for admissions for this
13　case that asked about specific jobs that Mr. Ramos
14　performed for Top Line?
15     A.   I remember -- the request for admissions I
16　forget -- I might need a refresher on some of the exact
17　admissions, but I know we responded to the Request For
18　Admissions.
19     Q.   I guess just generally I checked the docket.
20　It looks like the date it was converted was June 29th of
21　2023.  Does that sound right to you?
22     A.   It does.
23     Q.   So then is it fair to say that up and until
24　that date Mr. Ramos was working for Top Line?



1  Court's docket on the claims register, but I just don't
2  recall looking at this particular case.
3      Q.   Maybe these are all better for the accountants
4  now that I'm looking through them.  I mean, did you
5  review any documents for any of these -- I mean, I'm
6  assuming you know generally the ones that were
7  reclassified as you've read the report.
8          Do you recall whether you read any documents
9  related to those accounts or those loans?
10     A.   Let me take a quick look, if I could, on which
11 ones...
12     Q.   Yes.  It's on page 10 of the Wesler Report
13 number 35.  I mean, I could put it up.  Why don't we do
14 that.  That's probably easiest.
15     A.   I can see it right here.  I don't recall
16 looking at any -- first of all, it's hard to really tell
17 what these really were, but I don't recall looking at
18 any of those -- any of the underlying documents with
19 respect to that with the exception that at some point I
20 might have looked at the lease for the 347 Middlesex
21 Road property, because Top Line was a tenant and 347
22 Middlesex Road was the landlord.  I know I looked at the
23 lease at some point or another.
24     Q.   Let's see.  While we're on this, do you



1  I don't know, to Eversource, those are easy.  But a lot
2  of times the bank records simply say "deposit" without
3  identifying the source.  But I've never seen anything
4  from Mr. Ramos or anybody else that shows particular
5  transfers have been made from Mr. Ramos to Top Line.
6  So, the answer is, the best I can answer is, he may have
7  made transfers to Top Line, but I can't point to any
8  particular transaction where I can say, yes, that
9  actually came from Mr. Ramos.
10      Q.  And when you were reviewing Top Line's bank
11  records, how far back did you go in terms of your
12  review?
13      A.  We went back at least as far as 2019 I'm
14  pretty sure.  I'll have to take a look.  I believe we
15  got the records from 2019 through the filing date of,
16  you know, March 2022.  The bank records after that would
17  all have been attached to the Debtor's monthly operating
18  reports.
19      Q.  Then is it fair to say that your testimony is
20  that there were deposits going into Top Line accounts
21  that sort of we don't know the source of those deposits?
22      A.  Not sort of.  There are many deposits that we
23  don't know the source of because it doesn't state what
24  the deposit was, whether it was from a customer or



1 this in a little more detail, when you asked about
2 credibility with Mr. Ramos, in each of those
3 agreements -- he was entering into multiple agreements
4 with multiple merchant cash advance companies.  He was
5 selling his receivables at any particular time, and I
6 think he was effectively selling the same receivables to
7 multiple different parties.  That just speaks -- I don't
8 know whether it's a lack of sophistication or a little
9 desperation, but he had to know that in all likelihood
10 he was selling the same receivables to different
11 entities, which speaks to a certain amount of
12 questionable business practices.
13     Q.   And just to clarify, for all of those MCAs,
14 the recipient of those funds was Top Line, right, not
15 Mr. Ramos personally?
16     A.   With one exception.  But all the ones that are
17 listed in the expert's report, those were all, those
18 were all -- the recipient as far as I know Top Line got
19 the money.  There was one, I think it was called Bridge
20 Street, which when we got the documents, it was actually
21 Mr. Ramos personally borrowed the money, and then we
22 went through an analysis and we eventually settled that
23 case before litigation was commenced, and I forget all
24 the details on it.  We did settle it up.  But that



1  these additional ones?
2      A.   Yes.
3      Q.   Answer to number 2 I just want to touch base
4  on.  You stated, Mr. Ramos represented to Jeanne D'Arc
5  that the loan proceeds were going to be used for
6  personal purposes and not for business.  What is that
7  based on?
8      A.   Oh, Attorney Esposito is pulling up one of the
9  documents I'm sure we gave to you.  When Mr. Ramos --
10     Q.   The letter --
11          (Talking simultaneously)
12     A.   -- the October 31st letter he said the
13 proceeds of the refinance will be going towards
14 replenishing personal funds, investing in the
15 construction of the company.  The funds are not going
16 towards subject property -- the funds are not going
17 towards another property.  They said they were going to
18 replenish his personal funds not to be used for the
19 business.
20     Q.   Right.  And you are aware obviously in your
21 involvement in this case that subsequent to the letter,
22 Mr. Ramos has made statements to the contrary of the
23 statements in that letter, right?
24     A.   I know that's his position.



1    Q.   Right.  That was my question.  Just that he
2 made statements that contradict what he wrote in this
3 letter?
4    A.   Apparently so, yes.
5    Q.   This is answer number 3, the Trustee reviewed
6 bankruptcy schedules which list assets of $4,825,100 and
7 liabilities of $16,184,913.64.  Was that -- I'm just
8 wondering what the date of that was.  Like as of what
9 date was that evaluation?
10   A.   That would have -- well, the schedules are
11 supposed to list the amounts of assets and liabilities
12 as of the date of the bankruptcy filing, which was
13 March 25th.  They were not filed on March 25th.  They
14 were filed a couple or three weeks after that.  But they
15 were as of that date, as of the Petition Date.
16   Q.   So that figure is as of March -- like the end
17 of March or early April 2022?
18   A.   March 25, 2022, yes.
19   Q.   And then you said, "These figures do not
20 include a loan receivable of $2,067.000 by the Debtor to
21 347 Middlesex Road Realty Trust."  Is that the loan from
22 Mr. Testa?
23   A.   No.  That is a loan -- it's loans that were
24 allegedly made by Top Line Granite to 347 Middlesex Road



1  Let's see.  We talked about Testa a lot.
2           MS. STUDSTILL:  I think I may have maybe
3  less than thirty minutes left.  Do we want to take
4  a short break?
5           THE WITNESS:  Yes, I could use a
6  five-minute break.
7           MS. STUDSTILL:  I mean, we're getting
8  there.  I don't think I have too much more.
9           (Off the record)
10          (Sharing document on screen)
11     Q.   Do you recognize this?
12     A.   First page; but yes.
13     Q.   Okay.  Request Number 2 states, "The records
14  produced by the Defendant indicates that part of the
15  loan proceeds were to refinance an existing mortgage."
16  "Those records also indicate that Ramos received
17  $376,553.69 in 'new funds.'"  Did I read that right?
18     A.   Yes.
19     Q.   Did you do any investigation to determine
20  whether or not that amount or any portion of that amount
21  was put into Top Line's accounts?
22     A.   Without trying to -- without repeating
23  everything we talked about before, no, I did not.  Those
24  numbers came from HUD and RESPA, whatever everyone wants



1 to call them.
2     Q. I'm just scrolling through because we've
3 talked about a lot of this already. Request Number 5,
4 it asks about loans that Mr. Ramos made to Top Line and
5 your response was that, "Admitted that Mr. Ramos
6 represented that he made loans to the Debtor, and the
7 bankruptcy schedules reflect loans of $3,279,657." Did
8 I read that right?
9     A. Yeah.
10     Q. Were you able to determine all of the sources
11 of this amount reported as loans to Top Line?
12     A. I don't think I've done that, no. I don't
13 think -- I don't think there's anything attached to the
14 Proof of Claims showing when those loans were made.
15     Q. Are you saying Mr. Ramos didn't clarify when
16 he made these loans?
17     A. My recollection, and I don't have the claim in
18 in front of me, is that he made the representation that
19 he made the loans, but there were no documents, no loan
20 documents, no other documents supporting that number
21 that were attached to the Proof of Claim.
22     Q. Did you do any investigation to determine
23 whether or not that was an accurate figure?
24     A. Not yet. In part that's because we're a long



1 I don't think I got his personal bank statements.

2     Q.  I mean, I can represent that we turned them
3 over after we -- after the complaint was filed.

4     A.  Okay.  I can't recall looking at them in any
5 particular detail.

6     Q.  I can represent to you that based on my review
7 of those personal bank statements that Jeanne D'Arc,
8 that figure that we discussed, the cashout figure, is
9 not located in those records, which is why I was asking
10 if you had been able to locate that figure anywhere in
11 Top Line's records, because it would appear to me and
12 correct me if I'm wrong, that nobody really knows where
13 that 300 something thousand dollars went and I would
14 love to know.

15     A.  Well, from the records that were available to
16 me at the time I drafted these, I prepared these
17 responses, all I can tell from the HUD or the RESPA is
18 that that was the distribution.  Where the money went, I
19 don't know.

20     Q.  I mean, have you done any investigation to try
21 to figure out where that money went?

22     A.  No.

23     Q.  Request 7 through I think a lot of them talk
24 about services performed by Mr. Ramos for Top Line



1 the things he did.
2     A.   I have no reason to think he's lying about
3 that, but I don't have personal knowledge of.
4     Q.   And same with number 13, his services
5 including supervising job sites?
6     A.   Yeah, same answer.
7     Q.   Number 14, services included handling and
8 resolving complaints from customers. Is that your same
9 response for that one?
10     A.   Same response.
11     Q.   "Mr. Ramos' services, performed between
12 November 2019 and March 25th, 2022, benefitted the
13 Debtor." And you neither admitted nor denied that one
14 either?
15     A.   And the same response that I kind of gave
16 earlier probably this morning. At the end of the day,
17 between November '19 and March 25, 2022, the company
18 just fell further and further in debt. You know,
19 whether that ultimately was a benefit to the company or
20 to its creditors is a good question.
21     Q.   Is it your position that benefit cannot be
22 added to a Debtor while they're taking on more debt?
23     A.   No, I didn't say that. In this particular
24 case, given the extent of the debt, you know, there's a

