# EXHIBIT
# 3

**In the Matter Of:**

D'ARC V. WEISS

22-40216-EDK

---

**CHERYL WESLER**

*October 28, 2025*

---



800.211.DEPO (3376)
EsquireSolutions.com

1              UNITED STATES BANKRUPTCY COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3                    CENTRAL DIVISION

4

5                             .

  IN RE                       .      Chapter 7

6                             .

  TOP LINE GRANITE DESIGN,    .      Case No.:

7  INC.,                      .      22-40216-EDK

                              .

8        Debtor.              .      Adversary Proceeding

                              .      No. 24-04010-EDK

9  . . . . . . . . . . . . .  .

                              .      Gobles, Michigan

10                            .

  STEVEN WEISS, CHAPTER 7     .      October 28, 2025

11 TRUSTEE                    .

                              .      10:00 a.m.

12       Plaintiff,           .

                              .

13     vs.                    .

                              .

14 JEANNE D'ARC CREDIT UNION  .

  AND EDMILSON RAMOS,         .

15                            .

        Defendants.           .

16                            .

  . . . . . . . . . . . . .  .

17

18          VIDEOCONFERENCE DEPOSITION OF

19                  CHERYL WESLER

20             Taken by the Defendant

21

22          STEFANIE LOOMIS, CER-1870
            Esquire Deposition Solutions

23

24 Proceedings recorded by a reporter using electronic
  sound recording; transcript produced by the reporter and
25 transcriber.



```
 1                   APPEARANCES OF COUNSEL

 2

 3   On behalf of STEVEN WEISS, CHAPTER 7 TRUSTEE:

 4        STEVEN WEISS, ESQ., PRO SE
          SHATZ, SCHWARTZ & FENTIN, P.C.
 5        1441 Main Street
          Suite 1100
 6        Springfield, Massachusetts 01103
          413-737-1131
 7        sweiss@ssfpc.com
          APPEARED VIA VIDEOCONFERENCE
 8

 9   On behalf of JEANNE D'ARC CREDIT UNION:

10        JESSICA C. STUDSTILL, ESQ.
          LITCHFIELD CAVO LLP
11        6 Kimball Lane
          Suite 200
12        Lynnfield, Massachusetts 01940
          781-309-1500
13        studstill@litchfieldcavo.com
          APPEARED VIA VIDEOCONFERENCE
14

15

16

17

18

19

20

21

22

23

24

25
```



1   Q.   Okay.  Do you know who created those debtor-

2   provided financial statements?

3   A.   I believe he had accountants that prepared it for

4   him.

5   Q.   Okay.  Do you know whether it was accountants that

6   worked, you know, internally for Top Line, or whether it

7   was an accountant from, you know, an accounting firm?

8   A.   I believe it was an accounting firm.

9   Q.   Okay.  So you may have already said this, but did

10  you actually have access to Top Line's bank account

11  statements?

12  A.   I believe we had access to the statements, yes.

13  Q.   Okay.  Besides --

14  A.   But not access to the account.

15  Q.   Okay.  Besides the QuickBooks documents, are there

16  any other documents that you think would've been helpful

17  in terms of generating this report that you didn't have?

18  A.   We were not -- and there -- there might be the case

19  that they -- they didn't exist, but we did not have a

20  lot of the loan documents, so we don't have the detail

21  behind it.  We were given everything that I -- that was

22  available, but sometimes there just wasn't the document

23  that was needed.

24  Q.   Okay.  Were there any documents that you reviewed

25  but then ended up not relying on to form an opinion?



1  underneath distributions, and a lot of these -- also, if

2  you look even further up, I guess loan bridge SBA, which

3  is account 3216.

4        So all of these are included in distributions, and

5  we reclassified any account that was listed under that

6  section 3,200 distribution, and we reclassified it to a

7  loan if it had "loan" in the word -- in the description.

8  So like, loan bridge SBA, loan 7320.  If it didn't have

9  the word loan in it, we left it under distributions.

10 Q.   Okay.  So is it your position that these loans have

11 a direct correlation to the retained earnings portion on

12 the tax return?

13 A.   Yes, because distributions fall under retained

14 earnings.  So by classifying the loans here, it's

15 understating the liabilities.

16 Q.   What -- okay.  Well, let me go to your version just

17 so we can pinpoint the loans we're talking about.  Okay.

18 So I'm on Page 5, going into 6.

19 A.   Yes.

20 Q.   This red -- this red section that's been cordoned

21 off.

22 A.   Right.

23 Q.   So what documents did you review regarding -- I

24 mean, I guess I'll start with this one, the GEG 2C, LLC

25 (phonetic).



1   A.   We did not have the actual loan documents.  They

2   were not available.  So we reclassed anything that said

3   "loan" or looked like something that should be a loan,

4   and we put it up in long-term liabilities.

5   Q.   So for all of these accounts, then --

6   A.   Correct.

7   Q.   -- you didn't have -- did you have any documents

8   relating to these accounts at all?

9   A.   So we were able to -- and -- and Kristin Lytle can

10  talk probably more into this, but we were able to look

11  at proof of claims and determine, like, the loan bridge

12  SBA, that that -- there was a proof of claim filed on

13  that.  And that loan was between Top Line and the

14  government SBA.  And so it shouldn't be listed as a

15  contribution from Eddie, which is what it's looking like

16  here.  It should be up in long-term liabilities.

17  Q.   Okay.  So besides this -- and that was just 3216

18  you were talking about, the loan --

19  A.   Well --

20  Q.   -- bridge SBA?

21  A.   The -- I believe there's two SBA loans, but if you

22  look at the proof of claim, I believe -- it's been a

23  little bit since I've looked at the proof of claims, but

24  I believe it was -- there was two SBA proof of claims,

25  and I think it was close to 3 million.  So these -- even



1  Q.   Okay.  What about this first one, GEG 2C, LLC?  Do

2  you know whether that was a loan to Top Line or to Mr.

3  Ramos personally?

4  A.   I don't recall that, but that's negative.  It's a

5  negative loan.

6  Q.   But wouldn't you agree that if a loan was made to

7  Mr. Ramos personally and not to Top Line, that that

8  should be categorized as equity?

9  A.   I've never seen it classified this way.

10  Q.   Okay.

11  A.   If it's -- if -- if it's money that is being loaned

12  to Eddie personally, I've never seen it show up as a

13  loan under equity.  I've only seen it as a distribution

14  or a contribution from the shareholder to the business.

15  Q.   Okay.  So my question is, though, if any of these

16  loans were to Mr. Ramos personally, and then he's

17  putting that money into Top Line where Top Line is not

18  obligated to repay it, wouldn't that be equity?

19  A.   Can you restate that.

20  Q.   So -- okay.  Let's take an example.  Let's take

21  this one that says 3201, loan 50 mil, Eddie.  So let's

22  say whatever loan documents that, you know, you said you

23  didn't review, we don't know what this loan is or who

24  it's to, if this was a loan between someone to Mr. Ramos

25  personally, not to Top Line, wouldn't that be equity for



1   Top Line, as they are not obligated to repay that loan?

2   A.   Right.  But it -- it would be a contribution from

3   Eddie to Top Line.

4   Q.   And that would be equity, right?

5   A.   It would be a contribution, yes.

6   Q.   Okay.  So same with this miscellaneous loans.  I

7   mean, I know you just testified that you're kind of

8   assuming that these are the, perhaps, the Testa loans,

9   but we don't actually know that, right?

10  A.   Right.  But we also don't know where Eddie would've

11  come up with these kind of contributions.

12  Q.   Right.  But my question is, you know, we don't have

13  the documents underlying these miscellaneous loans that

14  are all in the positive, right?  I'm looking --

15  A.   Correct.

16  Q.   I'm looking at 3203.

17  A.   Correct.

18  Q.   So presuming that whatever documents exist or don't

19  exist, if those loans were to Mr. Ramos personally and

20  not to Top Line, those would also be categorized as

21  equity, right?

22  A.   If they were indeed loans to Mr. Ramos personally,

23  then yes, it would be considered a contribution, but we

24  have no documentation either way.

25  Q.   Right.  And then same with this -- the next one



1  down.  Loan is -- I'm looking at 3206, loan 400-1, only

2  deposits.  So that's all in the black, right, $307,000

3  every year from 2018 to 2022?

4  A.    Well, those are balances.  Doesn't mean that --

5  Q.    Right.  So -- right.  It's cumulative.  You're

6  right.  So -- but my point is, again, we don't have the

7  documents for this loan either, right?

8  A.    Correct.  Not that I know of.

9  Q.    So we don't know whether the loan was made to Top

10 Line or to Mr. Ramos personally?

11 A.    No.

12 Q.    And again, you would agree that if the loan was

13 made just to Mr. Ramos, that would also be categorized

14 as equity?

15 A.    Yes.  But I guess my concern or my question to that

16 is why is there close to, I forget, is it $9 million

17 worth of proof of claims, if not some of these -- if not

18 all of them are indeed loans to Top Line?

19 Q.    Well, I'm not really asking about that.  I'm asking

20 about, you know, all these -- all these items that

21 were -- that were moved, we don't have the documents to

22 show the terms of these loans, even if they were loans.

23 I mean, you kind of said yourself that you don't, you

24 know, really trust the accounting that was done here.

25 So how do we even know that they're properly



1   therefore the tax return don't seem accurate.

2   Q.   And so in a case like that where you don't believe

3   they're accurate, what -- you know, what do you do to

4   determine what is accurate or how to get a financial

5   picture of a company?

6   A.   In bankruptcy, it's not always easy.  We use the

7   information we're given.  Sometimes we use bank

8   statements and recreate.  This, we used -- you know,

9   they had financial statements, so we used financial

10  statements.  We did not prepare, obviously, these

11  returns.  But as an accountant, you use the information

12  you have.

13        As a bankruptcy accountant, there are definitely

14  holes and things that we're not certain of.  But when

15  you see a loan listed under equity, it does cause

16  concern.  I have never in my years seen it classified

17  that way.  Even if it's loan from the shareholder, or

18  not -- let me -- let me rephrase that.  Even if it's

19  money that the shareholder took out as a loan and then

20  personally contributed it, you would never classify it

21  like that.

22  Q.   And that's because you said it would be

23  appropriately classified as a contribution, right?

24  A.   Correct.

25  Q.   So let's say -- I mean, assuming these were, you



1  know, categorized in a way that you've never seen

2  before, it doesn't really change, you know, my ultimate

3  question, which was just that if this in fact is money

4  coming from Mr. Ramos where Top Line is not obligated to

5  repay it, it still should be equity, right, whether it's

6  categorized as a loan or a contribution?

7  A.   Yes.  But my stance or my assumption is that if

8  it's listed as a loan, it needs to be as a long-term

9  liability as a loan.

10 Q.   And that's based on the assumption that the loan is

11 to Top Line?

12 A.   Correct.

13 Q.   But we don't actually know that for any of these

14 except for perhaps the SBA loan?

15 A.   We don't know that for most of those, so it could

16 go either way, right?

17 Q.   Agreed.

18        MS. STUDSTILL:  Okay.  Should we take a break?

19 Sorry.  It's been more than an hour.

20        THE WITNESS:  That would be great.  I would

21 appreciate it.

22        MS. STUDSTILL:  Okay.  Let's take ten minutes.

23 So we'll come --

24     (A recess was taken.)

25        THE REPORTER:  We are back on the record at



1  11:26 a.m. Eastern Standard Time.

2  BY MS. STUDSTILL:

3  Q.   Okay.  I know I've sort of been bouncing around a

4  little bit, but I want to go back to -- I guess a

5  general question I have is, you know, you just testified

6  that a lot of times in these bankruptcy cases, you sort

7  of have to work with what you're given in terms of

8  documents.  What would be, you know, the ideal list of

9  documents to have to do your analysis in the sense where

10  you wouldn't say, oh, I wish we had had this document?

11  A.   Even the non-bankruptcy, you don't always get all

12  the documents you want.  But ideally, financial

13  statements, access to QuickBooks, bank statements, any

14  tax documentation, you know, like a 1099 or W-2s or

15  anything that supports the -- the tax return, payroll

16  reports, things like that that aren't always -- the --

17  the detail behind the tax return.

18  Q.   Okay.  And then I forget.  Did you say that you

19  weren't sure whether they had access to the QuickBooks

20  here, or I couldn't remember what you testified to?

21  A.   They did not have -- we did not have access to the

22  QuickBooks.

23  Q.   Okay.  And I think you said it was because the

24  password had expired or something?

25  A.   I don't know.  I said that could be a -- a -- one



1 | sort of review a company for solvency and you would say,

2 | you know, I can't make a determination because, you

3 | know, there's just so many documents we don't have?

4 | A.   We use the information we have to -- to make that

5 | determination.  And if sometimes we don't have much

6 | information, we state that, that we don't have much

7 | information.  This is the information we have, and this

8 | is our determination based on the documents we have.

9 | Q.   Okay.  Would you categorize this case as a case

10 | where you have, you know, not that much information or

11 | enough information or too much information?  I guess,

12 | where does it rank in your experience in terms of

13 | documentation?

14 | A.   There's quite a bit of documentation, actually.  I

15 | mean, sometimes we don't even have financial statements.

16 | So I would say that we have -- you know, we've made the

17 | assumption -- we've made the determination based on the

18 | information we have.  If we get different information

19 | and better information, we'd be glad to change our

20 | position.

21 | Q.   Okay.  So I want to go back to -- I want to go back

22 | to the debtor's version of the balance sheet.  So you

23 | didn't draft this exhibit, right?

24 | A.   We obviously added debtor-provided version.

25 | Q.   Right.  But in terms of the figures within it, do



1   A.    Right.

2   Q.    Okay.  Let me -- okay.  I want to look back at

3   your -- at the Wesler version of the financial

4   statements.  One second.  So now we're on the Wesler

5   version.  Besides the moving of those accounts that we

6   talked about previously, were any other changes made

7   between the debtor's version and the Wesler version?

8   A.    I believe that was the only change, was the loan

9   reclassification.

10  Q.    Okay.  So all of the figures within this were kept

11  the same?

12  A.    Correct.

13  Q.    Okay.  And do you know if any sort of review or

14  analysis was done to determine whether or not the

15  figures contained within this were accurate?

16  A.    I don't recall.

17  Q.    Okay.  Just one -- okay.  I'm going to Pull up

18  Exhibit A to the report, which is the Jeanne D'Arc loan

19  report.  One second.  Okay.  Can you see this?

20  A.    Yes.

21  Q.    And do you -- did you draft this document?

22  A.    I did not.

23  Q.    Do you know who drafted it?

24  A.    I believe it was Ethan Wood who prepared it.

25  Q.    And do you know what the -- what documents he used



1   BY MS. STUDSTILL:

2   Q.   Okay.  Let's see.  Okay.  I'm going to go to

3   Page -- this is the expert report.  Okay.  Sorry.  One

4   second.  Okay.  I'm on Page 6, number 16, where it says,

5   "We reviewed several years of W-2s as well as Mr. Ramos'

6   personal 1040 for multiple years."

7        Do you know what years of these documents that you

8   reviewed?

9   A.   I don't recall.  I know I looked at Top Line's

10  returns and saw that -- you can see the owner's wages

11  every year on Top Line's tax return.

12  Q.   Okay.  So you never reviewed any of Mr. Ramos's

13  personal tax returns?

14  A.   I did look at -- I don't recall how many years we

15  have.  I did look at one or two, and I looked at his

16  2023 W-2.

17  Q.   Okay.  Do you know whether you looked at his 2019

18  W-2?

19  A.   I did not.

20  Q.   What about 2020?

21  A.   No.

22  Q.   2021?

23  A.   No.  I just looked at '23, and I looked at Top

24  Line's officer wages.

25  Q.   Okay.  So where this says, "We reviewed several



1  years of W-2s," that's just referring to the 2023 W-2?

2  A.   I don't recall looking at any other W-2s except for

3  2023.  That's the only one I saw.

4  Q.   Okay.  Was there any attempt to get the rest of the

5  W-2s from the time period?  And the time period I'm

6  referring to would be the, you know, 2019 through 2022.

7  A.   I don't recall if we asked for those.  We were able

8  to determine his wages based on Top Line's tax return.

9  Q.   And how were you able to determine that?

10  A.   If you look at Page 1 of the tax return, the 1120-S

11  is the form.  And I don't recall what form number it --

12  or what line number it is, but it's officer wages.  So

13  if you scroll down, it's Line 7.

14        MS. STUDSTILL:  Okay.  And just for the

15  record, we're back on the Top Line 2019 tax return.

16  BY MS. STUDSTILL:

17  Q.   So Line 7 would be $86,000.  So that would be Mr.

18  Ramos' salary, correct?

19  A.   Correct.

20  Q.   And that wouldn't necessarily include -- or would

21  that include distributions?

22  A.   No, it would not.

23  Q.   Okay.  And would you generally agree that if the --

24  you know, you'll have to forgive me because I'm not an

25  accountant, as Steve well knows from his deposition that



1   never seen in my -- in my experience.

2       As far as his personal return, that basis, you look

3   at his basis in the company, and that net number affects

4   his basis.  So it's not directly reported on his tax

5   return, if that's what you're asking.

6   Q.   Okay.  And would that be, or should that be,

7   reflected in Top Line's tax return in your opinion?

8   A.   Should -- should what be reported?

9   Q.   The hypothetical I just gave where if Mr. Ramos is

10  paying in however much paid in capital and he is taking

11  distributions, but the distributions are less than the

12  paid in capital.  Would that be shown anywhere on Top

13  Line's tax return?

14  A.   It should be reported.  You know, the distribution

15  should be reported in -- under the retained earnings

16  under the equity section of the tax return.  I think

17  it's Page 5.

18  Q.   So that would be part of the retained earnings

19  calculation?  Is that what you're saying?

20  A.   Yes.

21  Q.   So that -- but that figure wouldn't necessarily be,

22  you know, all distributions, right?

23  A.   It -- it should be distributions, but it's not in

24  this case.  And here's another thing, is that because

25  whenever your distributions -- whenever your basis is



1  so we're going to keep them in equity because we don't

2  know?

3  A.    So if -- we -- we tried to be conservative here.

4  We did not reclassify everything.  And also, I mean,

5  additional paid in capital, that account to me seems

6  extremely high, which is saying that Eddie put -- or Mr.

7  Ramos put money into the company.  So if it's a loan, to

8  me it shouldn't be in equity.  That just -- as an

9  accountant, that just is like nails on a chalkboard, if

10  you will.

11  Q.    And so -- okay.  Let's back up.  Let's say -- I'm

12  assuming you've created sort of similar financial

13  statements in the past, right?

14  A.    Correct.

15  Q.    And when you create these financial statements,

16  what kind of due diligence do you do in terms of

17  categorizing where things should be placed?

18  A.    Well, if it states loan, I put it under

19  liabilities.  If it's a distribution, you know, and you

20  can tell that by looking at the detail, which, you know,

21  we've discussed we don't always have here -- we don't

22  always have in bankruptcy.  So you know, it -- it really

23  depends on the name.  If I don't have the detail and it

24  says loan, I'm going to put it in long-term liabilities.

25  Q.    So are you assuming that whoever or whatever



1  accountant prepared these didn't review the loan

2  documents as well?

3  A.   I don't -- I can't speak for them.  I don't know.

4  Q.   So for all we know, the accountant that produced

5  these original financial statements reviewed the loan

6  documents and determined that those loans, despite them

7  being called loans, should be in equity, right?

8  A.   I don't know if that was -- if that was questioned

9  to them or not.

10 Q.   But you just said that as an accountant it would be

11 sort of out of the ordinary to put a loan in as equity,

12 right?

13 A.   If they didn't have that level of detail, I don't

14 know.  If they just had the total account 3,200, which

15 is distributions, they might have just said, okay, this

16 is -- like example 2021 had a negative 1,000.  Well,

17 that means he took distributions of 1,000, so that's

18 what we're putting.  You know, it could have been not

19 separated out.  It could have been a summary of each

20 account.

21       Does that make sense?

22 Q.   Sure.  But I think -- I guess my point is that your

23 updated financial balance sheets kind of make this

24 assumption that these loans were miscategorized in the

25 first place, right?



1   A.   They -- that is our -- our assumption, yes, that

2   they were not classified correctly.

3   Q.   Right.  And I'm just trying to get at the root of

4   what that assumption is kind of based on.  Because we

5   don't actually know what Top Line's accountants did in

6   creating these financial statements, right?

7   A.   I can't speak for them.  No.

8   Q.   So for all we know, they could have had access to

9   all of these loan documents and did their due diligence

10   and properly classified them as equity, if they were in

11   fact loans to Mr. Ramos individually and not Top Line,

12   right?

13   A.   They could have.

14   Q.   Okay.  Let me go to -- earlier you said the

15   additional paid in capital seems very high.  Why does it

16   seem very high to you?

17   A.   Can we pull that up on the financial statements?

18   Q.   Yeah.  Is it on your version?

19   A.   It's on both.

20   Q.   Okay.  This is -- here, I'll go to your version.

21   A.   So if you scroll down, I think it's Page 6, and

22   it's account 3020, additional paid in capital.  I mean,

23   it continues to go up, you know, 200,000 between '17 and

24   '18.

25   Q.   And this is cumulative, right?



1 | any information -- any detail on that account.
2 | Q.   And so based on your review of all the documents in
3 | this matter, is it fair to say that this additional paid
4 | in capital, that it could be from anywhere?  We don't
5 | know where it came from, right?
6 | A.   Well, it would -- right.  We don't know where it
7 | came from.
8 | Q.   Okay.  Okay.  I'm going to go back to the report.
9 | Okay.  So I'm on Page 9, just where it says Opinion 1,
10 | "The debtor was insolvent beginning December 31st,
11 | 2019."
12 |      What is the basis for that opinion?
13 | A.   The basis for that opinion is the Wesler financials
14 | that we -- when we reclassified the loans.
15 | Q.   Anything else that that opinion is based on other
16 | than the Wesler financial statements?
17 | A.   Well, obviously it came from the financial
18 | statements that the debtor provided, is what we had
19 | used, and then we reclassified the loans.  I don't
20 | recall if there was anything else that was used to
21 | determine that.
22 | Q.   Okay.  And can you just -- maybe we've gone over
23 | this already, but can you just tell me sort of the --
24 | how you sort of arrived at the conclusion that all those
25 | loans should be reclassified?  I mean, was it just as

