# EXHIBIT

# 4

**In the Matter Of:**

WEISS V. D'ARC

22-40216-EDK

**KRISTIN LYTLE**

*October 28, 2025*

1           UNITED STATES BANKRUPTCY COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3                  CENTRAL DIVISION

4                                  .

5   IN RE                          .    Chapter 7
                                   .
6   TOP LINE GRANITE DESIGN,       .    Case No.:
    INC.,                          .    22-40216-EDK
7                                  .
            Debtor.                .    Adversary Proceeding
8                                  .    No. 24-04010-EDK
    . . . . . . . . . . . . . .    .
9                                  .    Kalamazoo, Michigan
                                   .
10  STEVEN WEISS, CHAPTER 7        .    October 28, 2025
    TRUSTEE                        .
11                                 .    12:59 p.m.
            Plaintiff,             .
12                                 .
        vs.                        .
13                                 .
    JEANNE D'ARC CREDIT UNION      .
14  AND EDMILSON RAMOS,            .
                                   .
15          Defendants.            .
                                   .
16  . . . . . . . . . . . . . .    .

17            VIDEOCONFERENCE DEPOSITION OF

18        KRISTIN LYTLE

19     Taken by the Defendant

20

21        STEFANIE LOOMIS, CER-1870
         Esquire Deposition Solutions

22

23

24   Proceedings recorded by a reporter using electronic
    sound recording; transcript produced by the reporter and
25  transcriber.



1                    APPEARANCES OF COUNSEL

2

3    On behalf of STEVEN WEISS:

4        STEVEN WEISS, ESQ.
         SHATZ, SCHWARTZ AND FENTIN P.C.
5        1441 Main Street
         Suite 1100
6        Springfield, Massachusetts 01103
         413-737-1131
7        sweiss@ssfpc.com
         APPEARED VIA VIDEOCONFERENCE

8

     On behalf of JEANNE D'ARC CREDIT UNION:
9
         JESSICA C. STUDSTILL, ESQ.
10       LITCHFIELD CAVO LLP
         6 Kimball Lane
11       Suite 200
         Lynnfield, Massachusetts 01940
12       781-309-1500
         studstill@litchfieldcavo.com
13       APPEARED VIA VIDEOCONFERENCE

14

15

16

17

18

19

20

21

22

23

24

25



1  Q.   Okay.  Were there any documents that you requested

2  to review that you were unable to review during your

3  work on this matter?

4  A.   So we asked for all W-2s and tax returns, I

5  believe, for Mr. Ramos for the 2017-through-2022 period.

6  I don't believe we were able to get all of them.  I

7  think we have three or four years of his personal

8  returns, but not all.  And I would have loved to get

9  into that QuickBooks file.

10 Q.   And why would the QuickBooks have been helpful?

11 A.   Well, for so many reasons.  So one reason and one

12 way that this report is different from other reports is

13 we could only report by year.  Other cases, we've been

14 able to report by month.  So I would have liked to have

15 been able to go in and see month by month what was

16 happening, or to be able to let -- to select

17 transactions by amount, or to be able to review and

18 drill down into the detail of each account.  You know,

19 what is happening?  Is it done correctly?  Does it make

20 sense?  Is it consistent with other accounts?  So

21 that -- that detail would have been fantastic to have.

22 Q.   And why would those details have been sort of

23 helpful in your assessment?

24 A.   Well, I mean, the more information you have, the

25 better, right?  If you can see money coming in to a bank



1  You have to pay it back.  The equity section is not

2  meant to report things that have a repayment obligation.

3  Q.   Okay.  We're going to get more into that later.

4  But other than the loans on the financial statements,

5  were there any other mischaracterizations that you

6  thought you saw?  Or was that the thing you were just --

7  you were talking about?

8  A.   The -- the equity section was the biggest red flag.

9  I mean, we didn't have any access to review their

10 revenue.  You know, I couldn't say if that was sales,

11 you know, expenses.  I mean, you never know if it's

12 personal or not without the detail.  But, I mean,

13 really, really, the equity section was where -- was

14 where we saw red flags.

15 Q.   What is your understanding of how that financial

16 statement was created?

17 A.   So it's my understanding that Edy had office staff,

18 Luciana perhaps, that worked in his QuickBooks file, and

19 that they provided their QuickBooks file to their tax

20 preparer for their corporate returns from there.

21 Q.   So it's your understanding that whoever prepared

22 these financial statements did have access to the

23 QuickBooks accounts?

24 A.   I think their financial statements were generated

25 from QuickBooks, so yes.  I'm unaware of any outside



1  Q.   So I'm on Page 5, going into Page 6 of the Wesler

2  edited version.

3  A.   Okay.

4  Q.   So let's start with this one, 3230.  It just says

5  GEG 2C LLC.

6  A.   Yes.

7  Q.   Do you know what documents did you review to

8  determine what this line item was?

9  A.   So that was one -- it's our understanding that Edy

10 was involved with other companies, and our presumption

11 was that that was another related party to Top Line, but

12 was not Top Line.  Perhaps it could have been a vendor

13 as well.  It -- that would make it an expense, not

14 equity.

15 Q.   And what was that presumption based on?

16 A.   That Edy had other corporate entities.

17 Q.   Okay.  Do you know what GEG 2C is?

18 A.   I'm not certain what that LLC is.  No.

19 Q.   Do you know who owned that LLC?

20 A.   I do not.

21 Q.   And did you review the loan documents or any

22 documents underlying this line item?

23 A.   No.

24 Q.   Okay.  The next one, 1558, it just says, "Top Line

25 Hardscape/Spray Foam."  Did you review any documents to



1  determine what this line item referred to?

2  A.   So Top Line Hardscape is a registered LLC in the

3  state of Massachusetts.  And I believe it's either Mr.

4  Ramos or Ms. d'Oliveira (phonetic), who is the

5  registered agent for the Top Line Hardscape.

6  Q.   Okay.  But again, other than your general knowledge

7  of that name, do you know what this line item is

8  referring to in terms of --

9  A.   Our assumption is that is a -- it is a related

10  party or intercompany loan.

11  Q.   And what is that assumption based on?

12  A.   Well, I think it's important to set the broader

13  context here, that Top Line Granite has one shareholder.

14  It's Edmilson Ramos.  There's no other company, entity,

15  trust, or individual that shares an equity position in

16  this company.  So when you have a business owner who

17  potentially has other business interests, and there's

18  funds transferred between the two, generally that is

19  recorded as an intercompany loan.

20  Q.   Okay.  So that assumption is based on your

21  knowledge that Top Line Hardscape is a related company

22  to Top Line Granite Design?

23  A.   Yes.

24  Q.   Okay.  And again, did you ever review any, you

25  know, any documents, bank statements, loan documents,



1   anything at all related to this line item?

2   A.   No additional documents were provided to us for Top

3   Line Hardscape.

4   Q.   Okay.  And what about this one, 3208 Global Stone

5   3208-1 Tiles?  Did you review any documents related to

6   this line item?

7   A.   So Global Stone has a similar set of facts as Top

8   Line Hardscape.  It's a, what we believe to be, a

9   related company based on the Massachusetts Register of

10  Corporations.

11  Q.   Okay.  But in terms of this line item and these

12  figures, did you review any documents related to that?

13  A.   No.

14  Q.   Okay.  And then the next line item down is also

15  3208, but it's Global Stone - Other.  And this shows, it

16  looks like money coming in beginning in -- at the end of

17  2018.  Did you review any documents in regards to what

18  these funds were from?

19  A.   Not specifically, no.

20  Q.   And then the next one's just the total, so I'm

21  going to skip that.  Okay.  3209 says, Accrued Rent, 347

22  Middlesex Road.  What is your understanding of what this

23  line item refers to?

24  A.   So it looks to me that that amount is due to 347

25  Middlesex Road for rent payments.  And there is a rent



1  obligation, or a lease obligation, between Middlesex

2  Road and Top Line Granite.  And right now, it is showing

3  as a balance due.  So in my opinion, the rent that is

4  owed to another company would be a liability of Top

5  Line, and the reverse would be true:  if they had

6  overpaid, then it would be an asset.  But either way, it

7  doesn't belong in equity.

8  Q.   Did you review the documents that correspond to

9  this line item?

10 A.   So I have not seen a lease, but historically, there

11 have been rent payments recorded on the various tax

12 returns that we reviewed relating to 347 Middlesex Road.

13 Q.   Okay.  So you haven't seen the actual lease though?

14 A.   No.

15 Q.   Okay.  3216, Loan Bridge SBA.  I'm assuming that is

16 the small business -- is it administration or

17 association?  I can't remember.  But I'm guessing that's

18 what your understanding is what that line item is?

19 A.   So our report does reference an SBA loan.  It's my

20 understanding that Edy got an SBA loan that was an EIDL

21 loan.  That loan, which was around $500,000, looks to me

22 to be correctly recorded in the loan section of the

23 financial statements.

24      There's also another claim in the bankruptcy for a

25 loan that's over $2 million to the SBA.  The -- the



1    this line item doesn't really match up with the numbers

2    that the SBA says they loaned to Top Line?

3    A.   So you're correct in that.  I do think that money

4    was received, and sometimes it wasn't put in the best

5    place to record it, if that makes sense.  So like, when

6    you look a little bit further down, if you look at 3206

7    and 3207, how one is noted only deposits, and one is

8    only noted payments, usually, you would not have a

9    single loan that has deposits in it and then records the

10   payments separately.  That would be a single loan.

11        So I don't know if -- I don't -- I -- like, I can't

12   say I saw a loan document that says 364,562.76 cents as

13   of 12-31-20.  I have not seen that.  But I have never

14   seen financial statements that say "loan" in the equity

15   section as many times as I have in this case.

16   Q.   Okay.  So my original question was:  I thought you

17   had said that the SBA loan, I think you said it was for

18   around 500,000-something dollars.  I thought you had

19   said that your understanding was that that was not this

20   3216 line item?

21   A.   That's correct.  Can I look at my financial

22   statements as an exhibit that I have printed; is that

23   okay?

24   Q.   Yeah, is it this?

25   A.   Yeah.  So -- well, so, if you scroll up -- okay.



1  So the very first line under long-term liabilities,

2  where it says SBA EIDL--

3  Q.   Right.

4  A.   I believe that is one of the items that's in a

5  proof of claim in the bankruptcy.  There was a loan

6  modification in 2021 for right around 500,000.

7  Q.   Okay.  So then, this loan bridge SBA is obviously

8  not referring to that loan?

9  A.   Correct.  The SBA has a second claim --

10  Q.   And it's --

11  A.   -- for over $2 million.

12  Q.   Right.  So again, it doesn't seem like this is

13  referencing that loan either, right, based on the

14  numbers?

15  A.   Well, I think they may have gotten a bridge loan as

16  part of their Chapter 11 proceedings.  I guess maybe

17  that would be a little bit before that.  But, like, a

18  bridge loan is designed to be when you have a funding

19  gap in something.  So I don't know if he worked with --

20  like, what bank he worked with, but I do believe it is a

21  loan and not equity.

22  Q.   And did you review any loan documents pertaining to

23  this line item?

24  A.   Not specifically, that I can recall.

25  Q.   Did you review any documents related to this line



1  item?

2  A.   Not specifically, no, but --

3  Q.   Okay.  And then 3215, Loan 7-3-20, New Agree Bridge

4  One.  Did you review any documents related to this line

5  item?

6  A.   No.

7  Q.   And the next line down is 3212 Loan 160 16A and

8  16B.  Did you have access or review any documents

9  related to this?

10  A.   No.

11  Q.   And 3201 Loan 50, Mil Edy, did you review any

12  documents related to this?

13  A.   No.

14  Q.   And then 3203, Miscellaneous Loans, were there any

15  documents that you reviewed that, you know, would've

16  shed light on what these numbers were, where they were

17  coming from?

18  A.   So we did review claims in the bankruptcy estate

19  for loans that were made.  I think some of them are

20  probably in there.  Like I mentioned, the large one from

21  the SBA is probably at least partially in there, or

22  fully, but I did not see the detail of what is in there

23  because it is likely more than one loan in there.

24  Q.   So you would agree that the SBA loan that we just

25  looked at, this 2785, is properly recorded on the



1  financial statement, right?

2  A.    Yes.

3  Q.    So then what are you basing your assumption on that

4  the other SBA loan would've just been lumped in with one

5  of these miscellaneous loans that you said was

6  miscategorized?

7  A.    Sure.  So can we review the prior page, please?  So

8  there's an SBA loan in excess of $2 million.  Where is

9  it up here?

10  Q.    So you're just assuming because it's not up here,

11  that it's in that one line item?

12  A.    Well, I think you have to assume because there's no

13  other amounts in loans that are even close to that $2

14  million SBA loan.

15  Q.    Is that assumption based on anything else other

16  than what you just stated?

17  A.    Well, the SBA has a claim for over $2 million, and

18  we did review the loan document relating to that 2

19  million.

20  Q.    But did you review any documents that pertain to

21  this line item, 3203 Miscellaneous Loans, that show

22  definitively that the SBA loan is included within these

23  numbers?

24  A.    Can you rephrase that?

25  Q.    My question is -- it's the same question I've been



1  asking for all the other line items:  Were there any

2  documents that you reviewed for this line item,

3  Miscellaneous Loans, that showed you what was included

4  in this line item?

5  A.   I guess -- I'm not sure what I could have reviewed

6  other than the SBA loan document.  Like, I could not

7  look at the detail of 3203 and say, "I see a loan

8  document that has December 20th, 2020, and then I see a

9  deposit in 3203 on December 20th for 2.1 million," or

10  something.  Does that make sense?

11      However, when looking at the financial statements,

12  you know, in their full context, I feel confident that

13  the SBA is owed over $2 million from Top Line Granite.

14  And I do not see a liability for over $2 million in any

15  other place on their financials.

16  Q.   Okay.  So that's what the assumption is based on

17  then?

18  A.   Yes.

19  Q.   Okay.  For 3206 -- I mean, this is all Loan 400:

20  3206, 3207, and 3210.  Did you review any documents

21  related to this loan?

22  A.   No, I don't think so.

23  Q.   Or these three line items that are referred to as

24  loans, I guess would be a better question.  So if any of

25  these loans were personal loans to Mr. Ramos, would that



1   you said $3 million?

2   A.   Yes, I -- I can't see.  I can look at my papers if

3   that's helpful.  So there's an account called 3020

4   additional paid-in capital.

5   Q.   Yep.  That's right here.

6   A.   So --

7            THE REPORTER:  I'm sorry.

8            THE WITNESS:  -- the beginning --

9            THE REPORTER:  You're not sharing your screen.

10           MS. STUDSTILL:  Oh, sorry.

11           THE REPORTER:  Just thought that might help a

12   little bit.

13           MS. STUDSTILL:  Thanks.

14   BY MS. STUDSTILL:

15   Q.   So just for the record, we're on the Wesler version

16   of the financial statements.

17   A.   Okay, perfect.  So -- so, when we're looking at

18   3020 --

19   Q.   Right.

20   A.   -- what that account is, is tracking what Mr. Ramos

21   alleges are his contributions as an equity shareholder

22   into Top Line Granite.  What I have a hard time as -- as

23   a CPA with -- is how it is possible that Mr. Ramos had

24   $3 million to contribute into Top Line Granite when his

25   business runs a loss five out of six years, in the



1  millions.

2  Q.   So these are cumulative, right?

3  A.   Sure.

4  Q.   So that means, in December or for the year of 2017,

5  right?  We don't actually know what -- when, just at the

6  end of the year, it's reported that he paid in about

7  $1.7 million in 2017, right?

8  A.   Sure.  So if you look at the difference between '17

9  and 2020, he's contributed 1.3 million.

10  Q.   Right.  Over the span of three years?

11  A.   I believe on his corporate tax returns, '17 and '19

12  both show losses of over a million dollars.

13  Q.   Right.  But that wouldn't be reflected in this line

14  item, right?

15  A.   Well -- well, that's -- that's correct, but I think

16  it's really important to think about the broader context

17  here.  If Edy's bottom line was $1,000,000, he -- at the

18  end of the day, after everything was paid, he earned

19  $1,000,000.  Maybe he kept that and reinvested it in the

20  company.  I don't understand how it's possible to do

21  that when you run massive losses and the salary that

22  he's paying himself is only 100 grand a year.  How is it

23  possible to have that capital infusion?

24  Q.   Well, did you review Mr. Ramos' personal bank

25  statements?



1  A.   I did not review his personal bank statements.  I

2  did review several years of his personal tax returns.

3  Q.   Did you ever request a meeting with Mr. Ramos to

4  try to ask him these questions?

5  A.   I guess I don't recall if we did, or did not,

6  specifically request a meeting.  Maybe Trustee Weiss

7  could confirm that.

8  Q.   Did you -- are you aware that Mr. Ramos deposed in

9  regards to this matter?

10  A.   Yes.

11  Q.   Did you review that deposition transcript?

12  A.   Yes.

13  Q.   So I mean, it seems to me, correct me if I'm wrong,

14  that you've kind of made a credibility determination of

15  Mr. Ramos.  Is that fair to say?

16  A.   On Mr. Ramos' character?

17  Q.   No.  Just his credibility as it -- as it relates to

18  these financial statements.

19  A.   I would say that there are things in his financial

20  statements that don't make sense to me.  So if -- if

21  that's credibility, I -- I suppose.

22  Q.   I mean, do you believe that these figures on the

23  paid-in capital are accurate?

24  A.   So we did ask for support from Mr. Ramos and his

25  CPA on Mr. Ramos' basis in Top Line, and we were not



1  A.    Correct.

2        MS. STUDSTILL:  Okay.  Should we take a short

3  break?  It's been, like, an hour.  Want to come back at

4  2:20?

5        MR. WEISS:  Sure.

6        THE REPORTER:  Sure.  That works for me.

7        MS. STUDSTILL:  Okay.

8        THE REPORTER:  We're off the record at 2:09

9  p.m.

10     (A recess was taken.)

11       THE REPORTER:  We are back on the record at

12  2:21 p.m. Eastern Standard Time.

13  BY MS. STUDSTILL:

14  Q.   Okay.  Earlier, you mentioned that you would've

15  liked to have sort of monthly documents to review for

16  this case.  Typically, when you're doing this kind of

17  review, do you have those documents?

18  A.   Yes.

19  Q.   Okay.  And why -- I guess, just explain to me why

20  it would be helpful to have month-by-month documents

21  rather than, you know, the end-of-year documents?

22  A.    Sure.  So it really would just help us drill into a

23  timeline.  You know, is your insolvency date really

24  September 30th?  Is it October 31st?  Really, just that

25  drill down and being able to be more specific.



1   where they were, then you would agree that Top Line was
2   solvent during this time period?
3   A.   At certain points, potentially.  I do think that,
4   as I mentioned before, that additional paid-in capital
5   number is unsupported, and our position in leaving it in
6   equity was conservative.  And if you remove that from
7   equity in its entirety, or partially, that even further
8   bolsters our insolvency position.
9   Q.   But again, you have no documents that support
10  moving the paid-in capital from where it is, right?
11  A.   So not -- well, not specifically the paid-in
12  capital, aside from other macro factors.
13  Q.   What do you mean by, "macro factors"?
14  A.   Well, when we talked earlier about Edy's salary, I
15  mean, Edy pays himself $100,000 a year.  He runs a
16  company that's running six figure, seven figure losses.
17  It's really hard for me to understand how, given those
18  factors, he has $3 million to put into his company.
19       Further, you know, if he was able to put money in,
20  let's say, when he then forays into some of these
21  less -- less than ideal lending situations, I don't --
22  like, you know, in bankruptcy, sometimes you don't have
23  everything.  And we're trying to look at all of the
24  things that are going on, and all of these signs point
25  to financial distress, and they point to, you know,



1  A.   I mean, I don't think I have any assumptions other

2  than what I just laid out, so, no.

3  Q.   Okay.  So I'm on Page 11, Paragraph 43:  "Our

4  methodologies for calculating the value of the debtor's

5  assets and amount of its liabilities are consistent with

6  best practices for recreating business records when

7  internal records provided to the firm are limited or

8  inconsistent with outside information."

9       So can you tell me about what methodology you used?

10  A.   Sure.  So when we're looking at documents, we

11  compare tax returns to financials.  We compare bank

12  statements to both of those things, tax returns and

13  financials.  You know, in an insolvency space, I think

14  we've spoken as to the limitations of the QuickBooks

15  file.

16       So as I mentioned, I would've -- I would've loved

17  to look at that QuickBooks file, but -- and that would

18  be a best practice.  You know, when I prepare tax

19  returns, and I'm able to look at the QuickBooks file, I

20  always do.  So it's not a best practice to not be able

21  to see the QuickBooks file.  But if it's not available,

22  you use all the other pieces and try to tie as many of

23  them together as you can.

24  Q.   Okay.  Do you agree that the records provided to

25  you for this matter were limited?



1  A.   Yes.

2  Q.   And do you believe they were inconsistent with

3  outside information?

4  A.   Outside of Mr. Ramos' and Top Line's internal

5  information or inconsistent with information outside of

6  the bankruptcy case?

7  Q.   Well, I mean, this is from your report.  It says,

8  "When internal records provided to the firm are limited

9  or inconsistent with outside information."  So I'm

10  trying to ask you what you mean by that.

11  A.   Sure.  So -- so, when I mean internal records, I

12  mean those records of the debtor or the debtor's

13  principal.  Sometimes the debtor's records are

14  inconsistent with the proof of claims.

15      So for instance, when we're talking about this SBA

16  loan, the SBA thinks Top Line Granite owes it $2

17  million.  The debtor's records don't say that.  So in

18  doing some of these things, when I'm looking at the

19  loans, like, when I look at the Toyota loans, they

20  match -- like, their -- their own records make sense.

21  You know, there's a loan amount, it goes down a little

22  bit every year.  Okay.  Then it's pretty close to what's

23  on the proof of claim.  The -- that all makes sense.

24      But sometimes debtor records don't match outside

25  sources.  And when you have a proof of claim with --

