# EXHIBIT 5

```
 1             UNITED STATES BANKRUPTCY COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3                    CENTRAL DIVISION

 4

 5   In re:                           .
                                      . Chapter 7
 6   TOP LINE GRANITE DESIGN,         . Case No. 22-40216-EDK
     INC.,                            .
 7                                    . Adversary Proceeding
            Debtor                    . No. 24-04010-EDK
 8                                    .
                                      . Lynnfield,
 9   STEVEN WEISS, CHAPTER 7          . Massachusetts
     TRUSTEE,                         .
10                                    . Friday, June 27, 2025
            Plaintiff,                .
11                                    . 9:59 a.m.
        vs.                           .
12                                    .
     JEANNE D'ARC CREDIT UNION AND    .
13   EDMILSON RAMOS,                  .
                                      .
14          Defendants.               .
                                      .
15                                    .
     . . . . . . . . . . . . . . . . .
16

17            VIDEOCONFERENCE DEPOSITION OF

18                   JONATHAN HIDALGO

19               Taken by the Defendant

20

21           STEFANIE LOOMIS, CER 1870
             Esquire Deposition Solutions

22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```



```
 1                  APPEARANCES OF COUNSEL

 2    On behalf of PLAINTIFF STEVEN WEISS:

 3         MARK J. ESPOSITO, ESQ.
           SHATZ, SCHWARTZ AND FENTIN P.C.
 4         1441 Main Street
           Suite 1100
 5         Springfield, Massachusetts 01103
           413-737-1131
 6         mesposito@ssfpc.com

 7    On behalf of DEFENDANT JEANNE D'ARC CREDIT UNION:

 8         JESSICA C. STUDSTILL, ESQ.
           LITCHFIELD CAVO LLP
 9         6 Kimball Lane
           Suite 200
10         Lynnfield, Massachusetts 01940
           781-309-1500
11         studstill@litchfieldcavo.com

12    On behalf of DEFENDANT EDMILSON RAMOS:

13 EDMILSON RAMOS, PRO SE

14


15


16    Also present:

17         Julio Suarez, Notary

18


19


20


21


22


23


24


25
```



1 we're talking about.  Were you aware that Mr. Ramos
2 was -- would sometimes use funds from Top Line to pay
3 that mortgage?
4 A.    Yes.
5 Q.    Okay.  Do you recall when you first became aware of
6 that?
7 A.    What date?
8 Q.    Yes.  If you can remember.
9 A.    I really don't.  I mean, it was whenever I started
10 first working on the account, we would review the
11 general ledger.  I would see the payments going to the
12 mortgage and the distribution account.  Now, when that
13 was, I honestly can't remember how far back we started
14 doing that.
15 Q.    Okay.  Did you ever have any conversations with
16 Mr. Ramos regarding those payments?
17 A.    No.
18 Q.    Okay. Did you ever give him any professional
19 advice regarding those payments?
20 A.    No, I didn't.  But I believe the partner on the
21 account, Mr. Helder Mendonca, probably did.  But
22 usually, you know, when it comes to payments that are --
23 that don't -- like, personal payments like that, we --
24 we always make sure first and foremost that they go into
25 the distribution account.  They're not taken as a



1  business expense, so -- but I'm sure Helder spoke to him
2  at some point about that.
3  Q.   Okay.  And if a client came to you asking that
4  question, what would your advice to them be about
5  whether or not they're able to use those funds towards
6  the mortgage?
7  A.   I would say that it'd be better off if they, you
8  know, wrote them a -- wrote themselves a check and then
9  from there, made the mortgage payment.  But if they want
10 to do it directly from their business account, they can
11 do that.  They just needed to let us know that those
12 mortgage payments have nothing -- you know, don't have
13 to do with the business.  And we'll make sure that
14 they're segregated into the proper -- into the proper
15 account, which is the distribution account.
16 Q.   Okay.  And can you explain, like I'm someone who's
17 not an accountant --
18 A.   Sure.
19 Q.   -- why it's important to make that distinction?
20 A.   Because what happens that -- as long as these
21 payments are on the distribution account, you're not
22 taking the tax expense, meaning that you're not lowering
23 your taxable income as a result.  It's basically a
24 tax-free equity distribution.  So it's important to do
25 that because, otherwise, if you're taking it as an



1  expense, you could be improperly reporting your net
2  taxable income to the IRS and, obviously, what we want
3  to avoid.
4  Q.   Okay.  And the -- the payments that were made on
5  this mortgage, were they properly reflected in the -- in
6  Top Line's records that you reviewed?
7  A.   Yes.  They were reflected in the distribution
8  account every year.  We always make sure of that.
9  Q.   Okay.  And were those -- were those payments
10 reported on Mr. Ramos' tax returns?
11 A.   They were reported on the K1 for Top Line Granite
12 as part of the distributions.  There's a box there for
13 that.  I think it's, like, 19d, something like that.
14 Then as far as on his personal return, he would get
15 credit for any interest that was paid during the year
16 based on the 1098-T.  1098 -- the 1098 they would get
17 from the mortgage company saying how much he paid in
18 interest and how much he paid in property tax if they
19 were paid through the mortgage as well.
20 Q.   Okay.  So I'm going to look -- we're going to look
21 at the tax returns in a little bit.
22 A.   Sure.  Uh-huh.
23 Q.   Let's see.  And is it fair to assume that, you
24 know, Mr. Ramos employed you and other people at RRBB in
25 order to make sure he was following the rules?  Like,



```
 1  documented?
 2  A.   There were no net distributions because what --
 3  what happens is that not only would Mr. Ramos take money
 4  out, but then he would also put money back in.  So if he
 5  put more money in in a given year than he'd had taken
 6  out, there's not going to be any distribution -- there
 7  would be no net distributions to report.
 8  Q.   Got it.  Okay.  And if -- if someone was trying to
 9  figure out how this net distribution number was
10  calculated, would that be in the ledger -- the
11  QuickBooks ledger?
12  A.   Yes.
13  Q.   Okay.
14  A.   Yes.
15  Q.   Okay.  Is there anything else in this tax return,
16  the 2019 tax return for Top Line, that deals with --
17  that would deal with mortgage payments?
18  A.   No.  This is the only place where you would see the
19  distributions on the K1.
20           MS. STUDSTILL:  Okay.  So now, I'm going to
21  pull up Mr. Ramos' 2019 tax return.  We can mark this as
22  Exhibit 2.
23       (Defendants' Exhibit 2 was marked for
24  identification.)
25  BY MS. STUDSTILL:
```



1  Q.   Oh.  I'm going to have to pull it up again.  Got
2  mad at me.  All right.  Let me stop sharing.  I'll start
3  again.  Hold on.  I love Zoom and I hate Zoom for this
4  exact reason.
5           Okay.  So I'm putting up Mr. Ramos' personal
6  tax return from 2019.
7           MS. STUDSTILL:  Can everyone see this?
8           THE WITNESS:  Yes.
9  BY MS. STUDSTILL:
10 Q.   Okay.  Can you direct me to where any distributions
11 would have been reported?
12 A.   Okay.  So --
13 Q.   Although, I guess -- well, let me ask a clarifying
14 question first.
15 A.   Sure.
16 Q.   If there's no distributions reported on Top Line's
17 tax return, would they be reported still potentially on
18 Mr. Ramos' personal tax return?
19 A.   No.
20 Q.   Okay.  So if they were to be reported on this tax
21 return, where would they be located?
22 A.   Okay.  The only time you would ever see
23 distributions reported on a personal tax return is if
24 there is a situation called "distributions in excess of
25 basis."



1  accuracy of the information you're given?
2  A.   For the most part, no.  I mean, if there was like a
3  new loan, for example, we would ask for the loan
4  document just so that we could accurately prepare an
5  amortization schedule.  This mainly pertains to, like,
6  vehicles.  But yeah, that's really only the time that we
7  would ask for, like, documents.
8          If it was, like, new assets that they had
9  loans for and we need to prepare an amortization
10 schedule, we need to see the purchase documents so we
11 can accurately prepare what those amortization schedules
12 were.  But otherwise, no, there wouldn't be much
13 underlying documentation we would see.
14 Q.   Do you know how Top Line tracked jobs it was
15 performing and -- and money it expected to -- to bring
16 in as a result of those jobs?
17 A.   No, I'm not aware of any -- I don't know how they
18 internally tracked that information.
19 Q.   And so does that also -- do you have any
20 information about how Top Line tracked jobs that were in
21 process?  I mean, it's basically --
22 A.   No, we didn't --
23 Q.   -- the same question but in process jobs?
24 A.   Right.  No, no.  I didn't -- no, we would -- we
25 would -- didn't -- we never saw how they kept track of



1  Q.   Yeah.  Is equity on here related to stock basis, or
2  are those totally different, unrelated?
3  A.   It -- no, they're -- they're related.  So the --
4  the net distributions that you see there, those will
5  decrease his -- his stock basis.  Or increase in the
6  case where we see positive numbers.
7  Q.   So a positive means he's -- his basis is increasing
8  by that amount on -- in these years?
9  A.   Yes.
10 Q.   And the red means his basis is decreasing by those
11 amounts?
12 A.   Those are the distribution amounts, yes.
13 Q.   Okay.  So in 2019, for instance, Mr. Ramos retained
14 or put in over $400,000?
15 A.   Net.  Yeah.
16 Q.   Net?
17 A.   Uh-huh.
18 Q.   And then so that should be reflected on his -- his
19 Basis Worksheet, correct?
20 A.   Right.
21 Q.   But if we look at the Basis Worksheet, we see that
22 his basis went down by 800-plus thousand dollars?
23 A.   Yeah.  It should have been on that Line 2, money
24 and your adjusted basis in property contributed.
25 Q.   So these -- one of these documents is inaccurate;



1  distribution amount would be higher.  Yeah.  That's it.
2  Just the net distribution amount would be higher if he
3  didn't have any of the offsetting contributions in
4  there.
5  Q.   Would that also have an impact on solvency because
6  now your liabilities have increased?
7  A.   It would.
8  Q.   And so, again, just to make sure I'm understanding,
9  the -- the Balance Sheet for Top Line, that's marked as
10  Exhibit 9, for Miscellaneous Loans to be equity, that's
11  only if they are coming from Mr. Ramos; otherwise,
12  they're not recorded properly?
13  A.   Right.  Those are all from -- those are all from
14  Mr. Ramos.
15  Q.   And you're not aware of any underlying
16  documentation of -- about those loans, are you?
17  A.   No, I'm not.
18  Q.   All right.  I'm going to switch gears a little bit.
19             And if financial statements provided to you
20  are not accurate, then that's -- that's obviously going
21  to have an impact on the accuracy of the tax return,
22  correct?
23  A.   Correct.
24  Q.   Did you ever find -- or did you ever detect any
25  errors in the way Top Line was categorizing things?



1  to minimize their tax burden?
2  A.   I mean, we would give them advice, like say,
3  towards the end of the year, Hey, maybe you want to buy
4  a vehicle just to, you know, take some depreciation
5  expense or maybe contribute to your 401(k) again to --
6  you know, so that way, you have another expense that you
7  can lower your tax burden a little bit.  But other than
8  that, the -- well, again, just some general advice.
9  Q.   And did you have any involvement in -- or did
10 your -- did your firm ever look at whether compensation
11 to Mr. Ramos was reasonable?  Was that ever something
12 you had any involvement with?
13 A.   I didn't.  But again, you know, his salary was, you
14 know, I think like 100,000, 110,000, 112.  So just on
15 its face, it seemed reasonable.
16 Q.   Assuming that he really had the basis to take those
17 distributions?
18 A.   Well, the distributions and his compensation are
19 two different things.  Compensation is what he reports
20 on his W-2.  Distributions are other monies that he
21 takes out of the company.
22 Q.   Right.  But if -- if he didn't have adequate basis
23 to cover the distributions, that would be taxable
24 income, correct?
25 A.   It would.

